James E. Magleby (7247)
 magleby@mcg.law
Christine T. Greenwood (8187)
 greenwood@mcg.law
Bryant L. Watson (16980)
 watson@mcg.law
**MAGLEBY CATAXINOS & GREENWOOD, PC**
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JEFF HAYS FILMS, LLC, a Utah limited liability company, and REVEALED FILMS, INC., a Delaware corporation,** | **COMPLAINT** <br><br> **and** <br><br> **DEMAND FOR JURY** |
| **Plaintiffs,** | |
| **v.** | |
| **TTAC PUBLISHING, LLC, a Nevada limited liability company, d/b/a THE TRUTH ABOUT CANCER, and TTAV GLOBAL, LLC, a Nevada limited liability corporation, d/b/a THE TRUTH ABOUT VACCINES,** | **Case No.  2:20-cv-747-CMR** |
| **Defendants.** | **Honorable Cecilia M. Romero** |

Plaintiffs Jeff Hays Films, LLC and Revealed Films, Inc. (collectively "Plaintiffs"),

by and through counsel MAGLEBY CATAXINOS & GREENWOOD, PC, hereby complain and

allege against Defendants TTAC Publishing, LLC, d/b/a The Truth About Cancer, and

TTAV Global, LLC, d/b/a The Truth About Vaccines, as follows:

**INTRODUCTION**

1.      This case stems from Defendants' failure to honor their contractual

obligations and promises to pay Plaintiffs certain reoccurring referral commissions.

**PARTIES**

2.      Plaintiff Jeff Hays Films, LLC ("Jeff Hays Films") is a Utah limited liability

company with its principal place of business in Salt Lake County, Utah.

3.      The sole member of Jeff Hays Films is Jeff Hays, who is a citizen of Utah.

4.      Plaintiff Revealed Films, Inc. ("Revealed Films") is a Delaware S-

corporation with its principal place of business in Salt Lake County, Utah.

5.      Defendant TTAC Publishing, LLC, which also does business as The Truth

About Cancer ("TTAC"), is a Nevada limited liability company with its principal place of

business in Portland, Tennessee.

6.      Defendant TTAV Global, LLC, which also does business as The Truth

About Vaccines ("TTAV"), is a Nevada limited liability company with its principal place of

business in Portland, Tennessee.

7.      Upon information and belief, the sole member of both TTAC and TTAV is

Cancer Step Outside the Box, LLC ("Cancer Step Outside the Box"), a Tennessee

limited liability with its principal place of business in Portland, Tennessee.

8.      Upon information and belief, the members of Cancer Step Outside the Box

are Ty Bollinger and Charlene Bollinger, who are residents and citizens of Tennessee.

**JURISDICTION AND VENUE**

9.      Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C.

§ 1332 because the Plaintiffs are citizens of the State of Utah, all Defendants are citizens of a different state than Plaintiffs, and the amount in controversy exceeds $75,000.

10.     Venue is proper in this district under 28 U.S.C. §1391 because Defendants are subject to jurisdiction in this district and a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this district.

11.     Defendants are subject to personal jurisdiction under the Utah long-arm statute and due process.  Defendants have substantial contacts with the Utah and have purposefully directed of activities at Utah residents, including without limitation because they have transacted business in Utah, solicited customers and affiliates in Utah, cause substantial and continuing harm in Utah, entered into agreements in Utah with persons or entities domiciled in Utah, and directed communications, payments, gifts, products, and product samples to Utah residents, including Plaintiffs.

**GENERAL ALLEGATIONS**

12.     Both Jeff Hays Films and Revealed Films are primarily engaged in the business of film production, including documentaries and documentary series.

13.     Jeff Hays ("Hays"), the principal of Jeff Hays Films, has been producing films for over twenty years.

14.     Over the course of his career, Hays has worked with well-known figures such as Amy Redford, Olivia Newton-John, Fran Drescher, Ron Silver, Kevin Costner, Hillary Swank, Linda Ellman, and Robert F. Kennedy, Jr., among others.

15.     In 2005, Hays was shortlisted for an Academy Award for *On Native Soil*, a well-known documentary about 9-11 and the 9-11 Commission, narrated by Kevin Costner and Hilary Swank.

16.     Revealed Films was co-founded by Hays and Patrick Gentempo ("Gentempo").  Revealed Films has produced multiple successful docuseries, including *Pain Revealed*, *Money Revealed*, *Christ Revealed*, and *GMOs Revealed*.

17.     TTAC and TTAV (hereinafter collectively, "TTAC" or "Defendants") are engaged in the business of making multi-episode documentary films known as "docuseries."  TTAC's docuseries include *The Truth About Cancer:  A Global Quest* ("*The Truth About Cancer*"), *The Truth About Vaccines*, and *The Truth About Pet Cancer*.

### The Affiliate Marketing Model

18.     TTAC markets its docuseries by recruiting customers to sign up for free online viewings of the films during what is known as a "Launch Period."  TTAC also sometimes offers subsequent free viewing periods called "Replay Weekends."

19.     Following a Launch Period or a Replay Weekend, customers have opportunity to purchase copies of the films, so they can own it and re-watch the series or share it with family and friends.  Customers are also offered related products, such as written materials about or related to the docuseries.

20.     As part of the marketing strategy for its docuseries, TTAC engages "affiliates" to promote the docuseries.  Affiliates are vital to the success of the venture.

21.     Affiliates typically market by sending emails to their contacts and promoting the series on their social media platforms.  TTAC provides recommended email content and creative materials for inclusion in its affiliates' emails and social media.

22.     When Plaintiffs connect a consumer to TTAC for a free viewing of a docuseries, the consumer is considered a "lead."

23.     When leads sent to TTAC by an affiliate purchase products, the affiliate is paid a commission on the sale.

24.     TTAC recruits affiliates for its docuseries in a variety of ways, including through its affiliate websites located at www.partners.thetruthaboutcancer.com and www.partners.thetruthaboutvaccines.com (the "Affiliate Websites").  The Affiliate Websites spell out the terms applicable to affiliates' services.

25.     For example the Affiliate Websites currently describe the affiliate arrangement as follows:



## Here's How It Works:

- Simply send a few prewritten emails and share posts on your Facebook and Twitter feeds between March 31st – April 24th encouraging your readers to check out our docu-series.
- Your readers get to watch our 9 day docu-series completely free with no strings attached
- We will offer your readers the opportunity to buy the replays and to support the movement
- You will earn 40-50% of every dollar they spend
- You get paid 90% of your commissions within 30 days and the remaining 10% 60 days after that (total of 90 days later to account for potential refunds)

26.     The Affiliate Websites tout the substantial amounts of money affiliates stand to make from their efforts, including by making statements such as the following:

> Our affiliate partners have been paid more than $5 million dollars for sharing our events with their audiences through email, Facebook, Twitter, etc.
>
> And by the way, our affiliates get to share pure high quality content with their list and NEVER send a sales email to their list while sharing our events.
>
> In our most recent docuseries (Oct, 2015) for *The Truth About Cancer: A Global Quest*, **affiliates have averaged $2.27 EPC earnings per click** across all platforms (meaning **this is an overall average EPC including Facebook, twitter and YouTube leads, etc. – not just warm email traffic).**

(Emphasis added).

27.     In addition, TTAC encourages affiliates to recruit other affiliates to promote TTAC's films, and it promises to pay "second tier commissions" on sales resulting from theses affiliated-recruited affiliates.

### The Lifetime Commission Agreement

28.     As part of its efforts to entice affiliates, and at all times relevant hereto, TTAC consistently represented – to Plaintiffs and all of its other affiliates – that commission payments for both sales to leads and clicks and sales generated by second tier affiliates would be "for life" (the "Lifetime Commission Agreement").

29.     "Lifetime commission" is an industry term of art referring to recurring commission payments for the life of the customer.

30.     For example, at all relevant times, the Affiliate Website for The Truth About Cancer prominently stated that lifetime commissions and lifetime second tier commissions were benefits of serving as a TTAC affiliate:

6



## Commission Structure

You'll earn 50% commissions on all digital products and 40% on all physical product sales (after product costs) for life.

Since our cookies never expire, your viewers will be tagged to you forever. So, regardless of what they buy from us, even if it's a year from now, you still get paid on every sale for every product — forever.

**Example:**

| | |
|---|---|
| $97 Digital Product X 50% = **$48.50 Commissions for you** |
| $297 Physical Product X 40% after product costs = **$118.80 Commissions for you** |

For all of you over achievers (super affiliates) – we also have a 2nd tier system in place for you. When you recommend us to your affiliates, any sales that they make, you'll receive 10% commissions on those as well (forever).

(Emphasis added).

      31.    The Affiliate Website for The Truth About Vaccines likewise represented that lifetime commissions would be paid to affiliates for sales to leads and clicks and for sales by second tier affiliates.  For example, the TTAV website included the following statements as of March 2017:

 Receive lifetime commissions for every sale from the clickers as well as the leads you send us

          ***

We recommend sending at least 3 emails to get the highest conversions and commissions.

TTAV works on a first referral ID basis, so the earlier you mail and share on social media, the more you'll make. We also pay lifetime commissions and hard code your affiliate ID which is much stronger than cookie tracking alone.

          ***

**Ready, Set, Refer ... $10,500 Referral Contest**

We're giving away $10,500 dollars in contest prizes to our affiliates who refer other affiliates on top of the 10% lifetime override you receive on every sale they generate.

(Emphasis added).

32.     Pursuant to the Lifetime Commission Agreement, TTAC tracks the leads and sales generated by its affiliates through the use of tracking links, which are included in affiliates' email and social media advertisements.  When a potential customer clicks on a tracking link and ultimately purchases a product or service from TTAC, TTAC is obligated to pay commissions to the affiliate who generated the customer.

33.     All customers who click on an affiliate's tracking link are permanently "linked" to that affiliate in TTAC's tracking system.  Thus, if a customer makes a subsequent purchase, TTAC is obligated to pay commissions to the affiliate for all subsequent purchases made by that customer.

**<u>Jeff Hays Films and Revealed Films Become TTAC Affiliates</u>**

34.     Through years of hard work and ingenuity, Jeff Hays Films and Revealed Films have built strong relationships with tens of thousands of consumers, followers, and other entrepreneurs.

35.     To maintain and build upon these connections, Plaintiffs actively maintain email lists of, as well as social media connections to, their respective contacts.

36.     Plaintiffs maintain these relationships in furtherance of their own business activities, including for purposes of marketing their own films.

37.     In addition, however, Plaintiffs have sometimes worked as affiliates for other companies, using their extensive contacts as a means to promote third parties'

products and services in exchange for commission payments.  This is a critical part of Plaintiffs' businesses.

38.     In the fall of 2015, in reasonable reliance upon TTAC's guarantee of lifetime commissions and the Lifetime Commission Agreement, Jeff Hays Films agreed to become an affiliate promoter of TTAC's docuseries, *The Truth About Cancer*.

39.     On September 16, 2015, Jamie Matorano, an affiliate manager with TTAC, emailed Jeff Hays Films to confirm its agreement to serve as an affiliate for *The Truth About Cancer* and provide a recommended a promotional timeline for the film.

40.     Matorano's email emphasized and reiterated the statements made in the Affiliate Websites about lifetime commissions, offering lifetime commissions for all purchases made by leads brought to TTAC by Jeff Hays Films.  She explained that "TTAC works on a first referral ID basis, so the earlier you mail, the more you'll make. We also pay lifetime commissions and hardcode your affiliate ID which is much stronger than cookie tracking alone.  (We also cookie and IP track too, because tracking your leads accurately means we get to send you bigger checks :-) )."

41.     On the same day, Jeff Hays responded to Matorano's email, confirming that Jeff Hays Films would promote *The Truth About Cancer*.

42.     The initial Launch Period for *The Truth About Cancer* took place in October 2015.

43.     To promote *The Truth About Cancer*, Jeff Hays Films sent ads tracking links prepared by TTAC to its email lists.  Jeff Hays Films also placed on its Facebook and other social media accounts ads tracking links prepared by Defendants.

44.     The efforts of Jeff Hays Films proved successful, and resulted in thousands of "leads," that is, consumers who signed up for a free viewing of *The Truth About Cancer*.

45.     Moreover, many of the leads provided by Jeff Hays Films ultimately purchased products from TTAC, including copies of *The Truth About Cancer* and related products and services.

46.     On October 27, 2015, Martorano wrote via email that Jeff Hays' Films' efforts had resulted in 21,538 leads.  For the products and services purchased by those leads, TTAC calculated it owed Jeff Hays Films a total of $117,050.70, and Jeff Hays Films was paid this amount in Utah.

47.     That same day, on October 27, 2015, Goldman emailed Jeff Hays Films, summarizing the final stats and sales boards of the first launch.  The sales board referred to each affiliate's respective earnings vis-à-vis other affiliates.  He stated that TTAC "share[s] these remarkable results not to brag but to celebrate WITH you because this would NOT be possible with you!"  Goldman observed that 79% of sales were tagged to an affiliate.

48.     Goldman stated that "we pay lifetime commissions.  This means that you'll continue receiving checks."

49.     "This is only the beginning," wrote Goldman in November of 2015, elaborating as follows:

> TTAC has gone above and beyond to ensure that you get compensated for months/years to come for all your hard work.
>
> All of the clicks that you've sent us have been tracked to you through IP tracking and cookies that are hard coded to your account in our affiliate program.
>
> All of your leads have an additional layer of tracking - we hard-coded their email address to your affiliate account so anytime a lead buys with their email address you will get credit for it.
>
> This is crucial to make sure you get full credit, because in today's times we all have multiple devices with constantly changing IP addresses. We live by the motto, "Happy Affiliates, Happy Business!" :-}.

(Emphasis added).  Goldman also wrote, "Of course, everyone who opt-ins [sic] from your efforts will be tagged to you for life."

50.     In February 2016, Martorano emailed Jeff Hays Films with an update on the results from the October 2015 launch of the Truth About Cancer, stating, "Plus you earned even more since then as we pay lifetime commissions."

51.     In the same email, Martorano explained that TTAC was doing a relaunch of *The Truth About Cancer* in the spring of 2016.  She encouraged Jeff Hays Films to participate in the relaunch and to recruit new affiliates to promote for TTAC, saying "let me know if you'd like to refer any new affiliates (you'll earn a 10% override on the life of their efforts) so we have time to lock them in and get them set under you" (Emphasis added). To stress the profitability of recruiting new affiliates, Martorano wrote, "For the Fall launch we had 3 affiliates earn more than $50,000 just on their referred affiliate's [sic] efforts."

52.     In August 2016, Martorano emailed Jeff Hays Films, again promising lifetime commissions, and emphasizing that leads would be tagged to TTAC forever: "As always, your leads are tagged to you forever, so expect some nice checks this Fall without having to lift a finger. :-)"

53.     In another August 2016 email, Martorano emailed Hays to announce some new projects, including *The Truth About Vaccines* and a series about cancer in pets.  The email again promised lifetime commissions for any sales to by a tagged lead:

> Anyone you have ever referred to us in the past is tagged to your account and if they purchase any of these new products we will be releasing to the TTAC tribe, you will earn commissions without even having to lift a finger.
>
> We appreciate all your previous (and future efforts) in supporting our events and getting this much needed information out to the world, which is why we like to pay our affiliates lifetime commissions on any TTAC Publishing products sold. We always strive for happy affiliates. :-)

(Emphasis added).

54.     Martorano also emailed Hays on October 26, 2016, following a live online event held by TTAC earlier that month to report that Jeff Hays Films had made over $27,000 in commissions that month, despite not having promoted the event.  Matorano said, "you gotta love life time [sic] commissions – You all are at: $27,803.99 in commissions due for October so far."  The entire sum of $27,803.99 was the result of lifetime commissions – Jeff Hays Films did not promote the event.

55.     TTAC launched *The Truth About Vaccines* in the spring of 2017.  Both Jeff Hays Films and Revealed Films participated in the initial launch and subsequent launches of the same docuseries through 2017 and into 2018.

56.     Jeff Hays Films and Revealed Films also participated in the promotion of TTAC's subsequent docuseries, *The Truth About Pet Cancer*.

57.     Jeff Hays Films and Revealed Films promoted *The Truth About Vaccines* and *The Truth About Pet Cancer* in reliance on the promise of lifetime commissions, including the following statement made in an email sent to both companies:

> • *You keep 100% of the affiliate commissions* – we'll use your affiliate link on every ad so you get lifetime value for every subscriber and buyer. 50% digital and 40% physical.

(Emphasis added).

58.     Jeff Hays Films also recruited a number of new affiliates to promote *The Truth About Vaccines*.

59.     As a result of the promotional efforts of Jeff Hays Films and Revealed Films with respect to *The Truth About Vaccines* and *The Truth About Pet Cancer*, Defendants sent commission payments to Plaintiffs in Utah.

60.     In September 2017, Martorano and another TTAC employee, Mark West, reiterated the Lifetime Commissions Agreement, again promising lifetime commissions for second tier affiliate sales.  In their joint email, they told Jeff Hays Films to "remember, you'll always win with the 10% LIFETIME commissions you receive for every sale made by the affiliates you refer.  Think carefully, refer the right partners, and watch the money roll in with a simple introduction."

61.     In August of 2018, TTAC summarized its payment of commissions to Jeff Hays Films, including second tier commissions, as follows:

**Total Leads: 34,077**

Total Commissions: $239,881.26

second Tier Commissions: $510.93

EPL: $7.04

62.     On August 14, 2018, Martorano thanked Jeff Hays Films for bringing 34,077 leads to TTAC.  She stated that Jeff Hays Films total commissions were in the amount of $239,881.26.  Jeff Hays Films was paid this amount in Utah.

63.     In September 2018, Martorano emailed Jeff Hays Films to "reassure" the company that its "new and existing leads are tracked and tagged to you for LIFE."

**Defendants Breach the Lifetime Commission Agreement**

64.     Upon information and belief, Defendants decided sometime in 2018 or thereafter to discontinue payment of lifetime commissions and second tier lifetime commissions.

65.     Upon information and belief, Defendants did not immediately notify Plaintiffs or its other affiliates of this decision in hopes that affiliates would continue to market for Defendants.

66.     Indeed, despite this decision, Defendants' promotional emails to Jeff Hays Films continued to reiterate its promises of lifetime commissions in August and September 2018.

67.     Upon information and belief, just days after TTAC decided to reverse course on its payment of lifetime commissions and second tier lifetime commissions, Defendants generated record-breaking sales due to sales promotions and docuseries relaunches that occurred shortly thereafter.

68.      Upon information and belief, Defendants also breached their obligation to electronically track its affiliates' leads, commissions, and second tier commissions.

69.      Upon information and belief, Defendants discontinued tagging leads to originating affiliates via first-cookie-in tracking, whereby the affiliate who *first* brought a consumer to TTAC were to be rewarded.

70.      Upon information and belief, Defendants switched from first-cookie-in to last-cookie-in tracking, and it appears they now track for just thirty days, rather than the promised lifetime of the customer.

71.      Upon information and belief, Defendants' switch makes it difficult to calculate the full amount of lifetime commissions and second tier lifetime commissions owed to Plaintiffs.  That amount is no doubt substantial, however, and exceeds $75,000.

72.      Indeed, the amounts owed to Plaintiffs continue to mount, as Defendants continue to promote and sell products and services to leads brought to them by Plaintiffs and affiliates recruited by Plaintiffs, all without payment to Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

73.      Plaintiffs incorporate by reference the preceding paragraphs.

74.      Plaintiffs entered into a binding and enforceable agreement with Defendants.

75.      Plaintiffs have performed all of Plaintiffs' obligations and conditions precedent to the agreement.

76.      Defendants have breached the Lifetime Commission Agreement between the parties, including by (a) failing to track Plaintiffs' leads via email address

pairing, IP address tracking, machine ID tracking, and first-cookie-in tracking, and (b) failing to pay Plaintiffs the amounts due to them under the Lifetime Commission Agreement.

77.     As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm, and are entitled to preliminary and permanent injunctive relief.

78.     As a direct and proximate cause of the breaches, Plaintiffs have been damaged in an amount to be determined at trial, exceeding $ 75,000, along with pre- and post-verdict interest, costs and attorney's fees.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

79.     Plaintiffs incorporate by reference the preceding paragraphs.

80.     The Lifetime Sales Agreement is a binding and enforceable agreement between Plaintiffs and Defendants.

81.     Plaintiffs have performed all obligations and conditions precedent to the agreement.

82.     Defendants were obligated to not destroy or injure Plaintiffs' right to receive the fruits of the agreements.

83.     Defendants' conduct is inconsistent with the agreed common purpose of the agreements with Plaintiffs, and Plaintiffs' justified expectations.

84.     Defendants' actions constitute material breaches of Defendants' obligations of good faith and fair dealing to Plaintiffs under the agreements.

85.     As a direct and proximate cause of Defendants' actions, Plaintiffs have

suffered and will suffer irreparable harm, and are entitled to preliminary and permanent injunctive relief.

As a direct and proximate result of the breaches of the covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial, in an amount exceeding $ 75,000, along with pre- and post-judgment interest, costs and attorney's fees as allowed by law.

**THIRD CAUSE OF ACTION**
**(Promissory Estoppel)**

86.     Plaintiffs incorporate by reference the preceding paragraphs.

87.     Defendants promised to pay lifetime commissions and lifetime second tier commissions to Plaintiffs for all sales to Plaintiffs' leads and all sales generated by Plaintiffs' second tier affiliates.

88.     Defendants knew or reasonably should have known that Plaintiffs would and did rely on their assurances that it would pay lifetime commissions and lifetime second tier commissions.

89.     Plaintiffs were induced to act and acted in reasonable reliance on Defendants' assurances by marketing on Defendants' behalf.

90.     Plaintiffs' reliance on Defendants' representations and actions caused Plaintiff to suffer significant losses, including but not limited to the loss of an amount to be determined at trial, but in no event less than $ 75,000, depletion of the going value of concern of its business relationships, and other damages.

91.     Plaintiffs are therefore entitled to damages in an amount to be determined at trial, exceeding $75,000, along with pre- and post-judgment interest, costs and attorney's fees as allowed by law.

## FOURTH CAUSE OF ACTION
### (Accounting)

92.     Plaintiffs incorporate by reference the preceding paragraphs.

93.     The various tracking mechanisms utilized by Defendants, and their discontinuation of those mechanisms, render unraveling the amount due to Plaintiffs so complicated that only a court of equity can satisfactorily unravel them.

94.     By reason of Defendants' conduct, Plaintiffs have been deprived of information to which they legally and equitably entitled, including without limitation, information related to the sales, earnings, profits, losses, and other financial matters relating to the Lifetime Sales Agreement and second Tier Agreement.

95.     On completion of the accounting, Plaintiffs are entitled to a judgment for the amounts that should have been distributed to them, in an amount to be determined by the jury.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

96.     Plaintiffs incorporate by reference the preceding paragraphs.

97.     Plaintiffs have conferred a benefit on the Defendants whereby Plaintiffs are entitled to compensation and damages.

98.     Defendants accepted the benefits of the Plaintiffs' efforts, albeit without informing Plaintiffs, with an appreciation and knowledge of the benefits, and did so

under circumstances whereby it would be inequitable for Defendants to retain the benefits without paying the value thereof.

99.     As a direct and proximate cause of these Defendants' actions, Plaintiffs have suffered and will suffer irreparable harm, and are entitled to preliminary and permanent injunctive relief.

100.     Plaintiffs are entitled to damages in an amount to be determined at trial, exceeding $75,000, and for costs and attorney's fees as allowed law.

## SIXTH CAUSE OF ACTION
### (Preliminary and Permanent Injunction)

101.     Plaintiffs incorporate by reference the preceding paragraphs.

102.     Defendants have violated Plaintiffs' rights and have otherwise acted in an unlawful manner, as set forth in the preceding Causes of Action.  Plaintiffs have a substantial likelihood of prevailing on the merits of these claims.

103.     Unless the requested order and injunction issue, Plaintiffs will suffer irreparable harm, including but not limited to loss of commissions in an amount difficult or impossible to quantify.

104.     The order and injunction will not be adverse to the public interest.

105.     The threatened injuries to Plaintiffs outweigh whatever damages the proposed order and injunction could cause to Defendants.

106.     There is a substantial likelihood that Plaintiffs will prevail on the merits of the underlying claims for which injunctive relief is sought, or there are serious issues on the merits which should be the subject of further litigation.

107.     Therefore, under Rule 65 of the Federal Rules of Civil Procedure,

Plaintiffs are entitled to a preliminary and permanent injunction including at least the following relief:

a.   That Defendants immediately resume their practice of tracking Plaintiffs' leads via email address pairing, IP address tracking, machine ID tracking, and first-cookie-in tracking;

b.   That Defendants immediately resume payment of lifetime commissions and second tier commissions to Plaintiffs as such payments come due; and

c.   Any addition relief warranted at law or necessary to protect Plaintiff's rights, to be determined by the facts and circumstances at the time of entry of the order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for judgment on each claim for relief as requested, including:

1. For damages in an amount to be determined at trial, exceeding $75,000;

2. For the preliminary and permanent injunctive relief, as described above;

3. For costs and attorney's fees as allowed by law;

4. For pre- and post-judgment interest as allowed by law; and

5. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Classic Air demands a trial by jury on all issues so triable.  *See* Fed. R. Civ. P. 38.

DATED this 28th day of October, 2020.

**MAGLEBY CATAXINOS & GREENWOOD, PC**

James E. Magleby
Christine T. Greenwood
Bryant L. Watson
*Attorneys for Plaintiffs*